I would like to set aside five minutes of my time for my co-counsel, Mr. Kasparian, and also to reserve three minutes for rebuttal. Your Honors, we're here today because the district court decision in this case, in the court below, has created the very situation that EPA hoped to avoid when it amended the 1990 NCP, National Contingency Plan, to adopt a substantial compliance standard. On the one hand, you have Carson Harbor Village, which is a private party that found contamination on its property. By all accounts, it had nothing to do with the contamination. It didn't cause the contamination. It didn't contribute to the contamination. But it voluntarily cleaned up the contamination. It did so by going to an environmental agency, in this case the Regional Water Quality Control Board, that had jurisdiction. It reported the contamination to the agency and sought the agency's involvement in the cleanup. The agency visited the property on a number of occasions, three or four times, according to the record. The agency reviewed the work plan that Carson Harbor proposed to implement at the site, made some comments on the work plan. There were revisions to the work plan, and the work plan ultimately was approved by the agency and implemented. The agency went back to the site, took confirmatory sampling to make sure that the work had been done in accordance with its guidelines, and issued a no further action letter, certifying that the cleanup had been done according to its guidelines. On the other hand, your honors, you have UNICAL, who by all accounts is the company that caused the contamination. UNICAL attended several of the meetings that were held by the Regional Water Quality Control Board at the site. UNICAL had its own environmental consultant present during the remediation that took place. We have the regional agency, we have UNICAL, but where's the public? Pardon? Where is the public? Where is the, quote, public participation, unquote, which is required under the statute? The public participation, first of all, was provided by the Regional Water Quality Control Board. So you would ask us to establish a legal principle that as long as there is a local public agency with environmental responsibility involved, that meets the public participation requirement of the statute? We would argue two things, your honor. First, the answer to your question is yes. As long as there is a public agency involved that's responsible for environmental oversight of the property, that agency is substantially involved in the work that's done at the site. That would satisfy the public comment provision, the public participation. However, in this case, even putting that aside as a standard, and we rely on the Bedford Affiliates case, which was decided by the Ninth Circuit, there was no public participation in that case. I'm sorry, the Second Circuit. Don't blame the Ninth Circuit. That's right. The Second Circuit, the Ninth Circuit hasn't addressed this issue, but that there was no public participation in that case. But even stepping aside from that, in this case, your honors, there was public participation. Now, there was no notice to the general public at large, but I would argue that under the National Contingency Plan, in every case, and this is what the substantial compliance standard gets to, you don't need to involve the general public at large. Here, the interested parties were notified. There were several meetings at the site. In fact, there were meetings that UNICAL attended, the county attended, the Regional Water Quality Control Board attended, Senator Dills attended on behalf of his constituents. He was notified. So there was public participation in that regard. This is not a situation where you had absolutely no public participation. And, in fact, the district court found as much in her findings. Did the tenants participate? Tenants were notified of the contamination on the property, and they were also notified 12 days before the remediation plan was put into effect about the contamination, so they were on notice of that. Were they invited to a hearing or public discussion of any kind? There was no public hearing in this particular case. Senator Dills, in this case, was a representative that represented the constituents, and I believe he was notified in this case by one of the constituents, so he would have been there to represent the constituents' interest. How about adjacent landowners? In this case, there were no adjacent landowners that would have been impacted. This is a wetlands that is in the middle of the mobile home property, and we're dealing with tar and slag material, which was in a relatively confined area. So there wasn't a concern that there were adjacent landowners that could have been impacted. There are really two issues. Aside from the public comment provision, I would just point out that in the cases, aside from the Second Circuit, the Seventh Circuit also has adopted this rule that public participation element of the NCP is satisfied by involvement of the agency, but also the Eighth Circuit and the Tenth Circuit, which in two cases ruled under those circumstances that there wasn't enough public participation, the difference in facts was miles apart from this case. In one case, they put a sign on the fence in English in a mainly Hispanic area that said, if you have any questions, call this phone number. And in the other case, there was an effort to actually hide the ball from the public. They published a notice in the paper in very small print and basically tried to ram something through before the public had an opportunity to evaluate it. That clearly is not the situation here. Judge Morrow here, the district court here, said that she agreed with the Second Circuit basically, crafted a test looking at several cases. But she basically said here that the agency participation just didn't rise to the same level or to the same degree as in the Second Circuit. And she equated this, I guess, to the Tenth Circuit's situation. She just said there just wasn't enough, as a matter of law, that participation or involvement by the Regional Water Quality Control Board was just minimal, insufficient to satisfy the public participation. Yes, that's what she said. And we believe that that was erroneous in this particular case. I mean, if you look at the Bedford affiliates case and you look at the railway case in Illinois, the NutraSuite case, the public participation in those cases was essentially the same as it was here. You have an agency that reviewed a work plan. They went out there before the work plan was prepared. But in Bedford Associates, the agency actually ordered the remediation. I don't believe there was an order in that case. Or the temporary. It was a temporary remediation plan in that case. And that, in essence, was – this wasn't a – The agency ordered that, didn't they? They ordered a temporary remediation plan, but that was the same thing here in that the agency ordered the contamination to be removed from the wetlands. So there was – There's a dispute here whether or not it was even necessary, correct? So the agency approved the method of removal or the remediation, but they didn't order it, did they? The agency ordered – Did the agency come here and say, you must remove this? Is there an order in – is there an order by the Regional Water Quality Board, control board, says you are ordered to remediate this contamination? There's not an order in the sense of a formalized order that you would have from the Regional Water Quality Control Board. But what the board did in effect here was order it. Initially, Carson Harbor had requested to leave the material in place. And the water board would not allow them to leave it in place. They then proposed a removal action because, as Dr. Amini noted in his testimony in his affidavit, there weren't any feasible other alternatives. You couldn't – this wasn't a long-term thing where you could vapor extract or do some other technology. You had this tar and slag and it had to be removed. They went to the board with a proposed cleanup plan. And the board initially rejected the cleanup levels that were proposed and said, no, this isn't good enough. You have to do more. We want you to remove more. So in essence, while it wasn't a formal order because you have a party that was voluntarily agreeing to clean it up, you didn't need the board to order them to do it. They were doing it voluntarily. But in essence, the board staff said, you have to clean it up. You have to remove it. And I believe that was the same situation. Was there a feasibility study here? That was the other issue that concerned Judge Morrow. That's correct. Judge Morrow, when it came down to it, said that she did not believe that there was a feasibility study. And here there was a remedial action plan prepared. And the remedial action plan addresses the removal of the site – at the site. And it also addressed – it did not address any other alternatives. And the reason it didn't address any other alternatives is because there weren't any. And the NCP itself says that in certain circumstances, you have to look at the nature and the extent of the contamination. And the NCP says in certain circumstances with a private party, a more focused remediation plan may be appropriate. In other words, it doesn't make sense to evaluate infeasible alternatives. And here, at the very least on the record, there's a disputed issue of fact as to whether there were any other alternatives. We believe there weren't. Other than removing it or leaving it in place. And the Regional Water Quality Control Board had already said you cannot leave the material in place. So there wasn't anything more that could be done. I'm going to go back to the first issue for just a moment before we leave that. Outside of the Casparian Declaration and the late-filed Amini and Close Declarations, what evidence is there in the record upon which you rely to create an issue with respect to summary judgment? You're talking about the public participation issue? Yes. So we're going back to that for just a moment. In the record, there is deposition testimony from Mr. Ross, who was at the Water Board. He was the regional representative. That as a matter of fact, he had been to the site three or four times. He had had several meetings. That in one of the meetings, there was 12 to 15 people present. And one of the exhibits to his declaration was a list of all the people that were present at one of those meetings, which was in May of 1995. In addition to that, there's testimony from UNICAL's representative, Mr. Salisbury, that he attended meetings at which the Water Board was present, that he in fact raised an issue at one of these meetings about whether the material could be left in place or whether it actually had to be removed. Those, just to name a couple of things, and Mr. Ross's- Absolutely. Because the interested parties in this case were involved in participation with respect to the methodology that was being used and proposed to remediate this particular site. You're below eight minutes now. So you mentioned earlier that you wanted to share time and then still reserve some time. Yes. And so I'll step aside now and let my colleague, Mr. Kasparian, address the evidentiary issue. Good morning, Your Honor. I may please the Court. Tom Kasparian on behalf of Appellant Carson Harbor Village. I'd like to briefly address the District Court's ruling regarding the admissibility of 38 documents, letters mostly, that were introduced in opposition to the motion for summary judgment on the issue of compliance with the National Contingency Plan and specifically the public comment factor. The issue here is authentication, right, or not? Excuse me, Your Honor? The issue here is authentication or not? Well, not really, Your Honor. Really, the issue is timeliness. There's not really any serious contention by anybody that these are not authentic letters. There was an objection raised on that ground by another party early on in the briefing process. Upon reviewing the trial court's tentative ruling, which included sustaining that objection, we introduced prior to hearing declarations from Carson Harbor's former and current attorney, Mr. Close, who was the author or recipient of about half of those letters, and a declaration from Carson Harbor's environmental consultant, Dr. Amini, who was the author or recipient of really the rest of those letters. And there's no contention by any of the parties or by the court that these were not sufficient to authenticate the letters. Rather, if you really get down to the bottom of the trial court's ruling on this matter and its footnote, it's an issue of timeliness. Upon production of these declarations on the day of hearing, the court entertained an objection on the basis of timeliness, and the court ruled later. Now, at this objection on the basis of timeliness prior to the hearing, there was no contention that there was any prejudice to the parties from this authentication issue being rectified prior to hearing. No contention of any harm or unfair surprise. There couldn't be. These were the very same letters that had been introduced with a prior declaration, which the court found insufficient for authentication. Rather, there was just this claim of timeliness issue. And on the issue of timeliness, really the question is whether or not the failure to previously produce the evidence causes any harm or prejudice to the other party. Again, there's no contention, let alone evidence, that there would be any harm to the other parties. And, of course, as I say, there couldn't be. Whether or not there's substantial justification, therefore. And as we set out in our motion, there were reasons the due date for this evidence being presented was suddenly moved up by seven days. Your Honor, the issue in summary judgment is whether or not sufficient evidence can be adduced at trial. In this case, it's very clear that if the participation of the RWQCB, the oversight of the RWQCB in the cleanup is not sufficient for the public comment, that these 38 letters can and will be produced and admitted at trial. The issue here really is a matter of timeliness. None of the cases cited by the Court or by any of the parties examines a situation where this objection on authentication is completely rectified prior to the hearing. In this case, it is, and there's no contention otherwise. Thank you, Counsel. Thank you, Your Honor. Your side has reserved time of 3 minutes, 45 seconds. Counsel for the opposing party? Thank you. May it please the Court. Kurt Weissmuller representing Appali Unical Corporation. Let me perhaps just begin with responding briefly to Mr. Kasparian's comment about the admissibility of the evidence. I think Judge Morrow was quite clear that even had she not excluded the documents, upon review of them, it would not have changed the outcome of the holding. And so there simply is no prejudice as a result of that ruling. And I don't think anybody disputes that the timeliness question is well within the Court's discretion to rule in the way that she did. Let me also point out, if I may, one of the things that may have been overlooked, certainly in Counsel's presentation, was that in Bedford, whether or not the Court agrees with the ultimate holding in that case, Your Honor, Judge Paez, you were correct that that was an interim remedy that was ordered in that case. It was a soil vapor extraction system and it was done in order to remove the source of the contamination because the contamination was leaching into groundwater and it was simply spreading the problem. So as an initial, almost an emergency, remedial interim measure, they ordered that this soil vapor extraction system be installed. Now, interestingly, the Court acknowledges that that was done without public comment, but then the Court goes on to say, and this is on the Bedford decision page 421 through 422, under the supervision of the DEC, the soil vapor extraction system has been operational since 1996. Once this interim remedial measure is completed, public comment will be solicited regarding the remedial investigation feasibility study or the completion of the remediation if no further action is needed. So even Bedford contemplated that the ultimate final remedy was going to involve public participation. That is one of the reasons I believe that Judge Morrow fashioned the approach to this case that she did, which is even accepting Bedford, one needs to look at whether or not the public agency itself has satisfied the public comment period. There's a lot of public data, public input into this whole process. Assume just for the sake of argument, the 38 letters come in. Already in are the notes of the meetings with various affected people and so forth. Where do we draw the line? Shouldn't that be enough, especially with the participation of the regional environmental agency? Well, Your Honor, let me begin my response by maybe pointing to the Sherwin-Williams case, which we featured in our papers. There the Court said, and I quote, public comment means just that, public comment. And I'd also like to walk the Court through the structure of the NCP in a moment about the importance of that. Public agencies may, in fact, have a deep concern with certain remedial approaches. For example, if you have a large waste site, you will see that public agencies are typically very heavily involved. Interestingly, the NCP itself requires that when a public agency does the ultimate in terms of involvement, which is conduct the remedy itself, it must conduct public hearings and satisfy the public comment period. So it's difficult to see how under the structure of the regulation and CERCLA, you can have the public agency alone substituting. Then if you look at this case, what we have, we have a number of parties at these meetings, but if you look at who they are, they are primarily the parties that have been defendants in this case, all the way back to when there were many other defendants remaining in the case, such as during the Courts on Bunk ruling in Carson Harbor. Those parties were represented because they were accused of having some responsibility for the contamination. And in essence, demand letters were sent to all of us, and we were given the opportunity to attend and watch the remedy be developed. Interestingly, Judge Morrow looked at the record and said, well, you know, the only notice that actually went to the residents, who I would think since they live within, some live within a stone's throw of this ravine, in this trailer home community, they would have the primary interest in seeing that the remedy is undertaken in a way that is what's been called a CERCLA quality cleanup, cost effective, not necessarily of high importance to them, but certainly the risk posed by any residual contamination would be of interest to them. Probably, I would submit, far more interest to a resident who has hazardous waste contamination over their backyard fence than a distant or sometimes even anonymous public agent. He also says they were all notified. They were notified in the following way, Your Honor. They were notified through a one-page piece of paper that said, we have discovered contamination in the wetlands. It includes lead, which requires us under California's health and safety code, what's commonly referred to as Proposition 65, to notify you and warn you that if you are going to approach that wetland, you'll be exposed to lead, which is a carcinogen and a reproductive toxin. Basically, that is a notice that did anything but encourage inquiry. What it did is it discouraged inquiry. In fact, Judge Morrow in her ruling indicated that one of the reasons Senator Dills was involved is because the residents had to resort to that avenue in order to get some information about what was going on at the site. Really, that's the key. I think if one looks at the NCP itself, the public participation requirement really is featured quite prominently. Substantial compliance with the NCP is not a buffet counter approach where you might choose one or two elements out of many and satisfy them and achieve the standard. Rather, there are two aspects to the NCP that are indispensable for a circle of quality cleanup. One is the FS, the RIFS, and two is the public participation component. When one looks at the structure of the NCP, which is found at 40 CFR 300.700 governing private party cleanups, EPA essentially says the following, that a private response action will be considered consistent with the NCP if when evaluated as a whole it's in substantial compliance with two provisions, subsection 5 and subsection 6. Subsection 5 of that regulation goes through the various stages that a party claiming response costs needs to undertake to evaluate the severity of the problem. Ultimately, it requires that the RIFS be performed. The FS portion of it, which Judge Morrow found was lacking here, simply says the requirement is quite explicit. The primary objective of the FS is to ensure that appropriate remedial alternatives are developed and evaluated such that relevant information is presented to the decision. I want to come back to the FS in just a minute, but I'm just wondering what was the minimum necessary under your theory? The calling of a public hearing at which maybe half a dozen people might show or maybe a thousand people would show, but a notice in the press that there will be a public hearing on X date, does that meet, would that have met the statute in this case? The NCP provides us in the cases interpreting this public participation requirement essentially say if there is a meaningful opportunity for the public to participate or to comment on the remedy selection process, that will satisfy the statute and the regulation. So any one of those, Your Honor, would or could have in this case, depending on how it was executed, satisfied the public participation component. In particular, I mean, this particular property, I mean, it could have been as simple as this. There is a clubhouse in the middle of this mobile home park development that has a huge assembly room. They could have called a meeting or two and said, okay, this is what we're planning to do. Here's Mr. Ross from the regional board who is reviewing our proposal to clean this stuff up. Is the record totally devoid of any tenant having exhibited some input into this process? Of the tenants? I know of nothing in the record that suggests the tenants had any input other than to contact the political representatives who then appeared at one or two of the meetings. I forget exactly how many. The other question I want to come back to is the feasibility study part. Why would a feasibility study be required if the proposed solution is the ultimate solution, removal of all of this material? Why go through a silly exercise to look at other possible alternatives which would have no meaningful aspect to this situation? Carson says they're going to do the most expensive or they're willing to do the most expensive solution. Why waste your time going through less expensive or less effective solutions? Well, Your Honor, that raises the exact point. You don't know if there are more effective solutions or less effective solutions or more cost effective solutions, all required by the NCP incidentally, unless you do the feasibility study. And counsel is quite right. The NCP under the 1990 version, which we have today, says that a focused feasibility study may be appropriate, especially in smaller, less severe cases of contamination. But they say that under a focused FS, fewer alternatives are evaluated. It does not say one alternative is evaluated. And in this particular case, we don't know, for example, whether we have a circle of quality cleanup because we don't know if either a no action alternative would have been appropriate here or, for example, what about treatment in situ, meaning leaving the material there but immobilizing it in such a way that it does not spread or expose persons. Does your client care which alternative is adopted? My client may not, Your Honor, only to the extent we're being asked to pay for it. And I'm happy to address that issue. But the public may because what you have here in particular is, although there was removal of this material, not all of it was removed. Some of it was inaccessible. Some of this tar and slag material was wrapped up within the roots of a protected willow tree on the site. So it's still there. When the regional board approved the closure saying, okay, Carson Harbor, you did enough, fine, it took some samples and that sampling showed that there were in fact lead levels still above the action level. But they approved it anyway. So this site, although it may be a minimal risk, we don't know because risk assessment wasn't done, presents a risk at some level. And could, for example, an engineering control have been more efficient, whereby one simply creates barriers so that the public could not have access to the ravine? Could you have kept it with some other institutional or further engineering control so that there's no chance for water to push the lead down into the soil and the groundwater? There's many different options. And a futile exercise, no. I don't think anybody is interested in that. But those instances really are reserved for situations where you have an emergency situation, where the agency says, okay, we've got some real big problems here. We have groundwater contaminated. It is spreading to drinking water wells. We are going to order something immediately. And like in Bedford, you had an interim approach where maybe you can get past a more full-blown feasibility study, as opposed to when you have a situation as you do here, where it's a permanent solution to the problem. You know, the public notice that you talked about, I mean, I guess it seems like all interested parties were involved, to some extent, with the exception of the tenants. With the exception of the tenants, Your Honor, that's correct. And also, you mentioned earlier, the surrounding property owners. Counsel seemed to suggest that there really weren't any meaningful adjacent property owners. Your Honor, it may be the case. I do know one thing. The ravine, as was mentioned, traverses this property. It is a storm channel. So it comes in at the north end, washes over the contamination, and flows out the south end. It goes somewhere. We don't know where. But typically, in cases such as this, if you're going to try to satisfy the public participation element, you will publish something and try to involve. Was there any other public agency that had responsibility for this particular problem, other than the Regional Water Quality Board? Well, there could have been. You see, that highlights one of the other concerns that one would have by saying that the public agency participation is enough. Here, Carson Harbor, the appellant, chose to approach the Water Board with its proposed solution in an effort to get a no further action blessing. This is not an air quality issue, obviously. No, no. But there is another agency, Department of Toxic Substances Control, for example. They share jurisdiction with the Regional Board in many instances. Now, interestingly, within the environmental community, it's pretty well known that the DTSC is going to often impose much more rigorous requirements and adhere to the strictures of the NCP, whereas the Regional Board has the reputation for being a bit more fluid in its approaches and more flexible in terms of addressing contamination. Is there anything in the record with respect to whether this other agency was involved in any way, whether they were consulted or? Nothing in the record whether they were consulted, involved. Not a shred. Okay. Anything further? Unless there's any questions. No more questions. Thank you, Your Honor. I'm not sure who's going to have the time. Mr. Amantea? Yes, you may have. Let me just address that last point first, Your Honor, in terms of whether there was any other public agencies involved. Well, there could have been involved. Well, there were other public agencies involved. The reason the Regional Water Quality Control Board was selected as the appropriate agency in this case is because we're dealing with the wetlands, and that would have been under the jurisdiction of the Regional Water Quality Control Board, as well as the Department of Fish and Game, which was notified, as well as the Army Corps of Engineers. And in California, and it's well known to counsel and everybody that it's in the environmental field, that you don't have to go to every single agency. We have a Cal EPA now, but it doesn't function like the federal EPA. You don't have to go to every agency to get approval of your plan. You go to one agency, which acts as the lead agency, and that agency, to the extent that other agencies need to get involved, that agency will involve the other agencies. So, for example, if the Regional Water Board felt like there were issues outside of its jurisdiction, it would have gone to the DTSC, the Department of Toxics, and gotten them involved. Well, did it? Is there any evidence that they did in this case? They didn't, because there weren't any issues in this case, apparently, that the agency felt like they needed to go to the Department of Toxics. What about Mr. Weissmuller's point that you could have had a hearing or two, or at least a meeting or two in the community center, or whatever it was inside this trailer park? Well, first of all, there was more than one notice to the residents of the Mobile Home Park. There was the notice that Mr. Weissmuller alluded to, which was an initial notice, and then on July 5th, 1995, there was a notice sent to the residents notifying them that commencing on July 17th, there would be the remediation effort going on and notifying them that there was a removal action and why it was being undertaken. So, in this case, there was more than one notification to the residents, and I would argue that the residents were involved in these meetings through their representative, Mr. Dill, who had more knowledge about these things than I would say any individual resident, and not only that, in this case, the most protective measure with respect to the environment was selected. At the hearing, in the court below, Mr. Nyquist, who is a colleague of Mr. Weissmuller, was asked by the court, does UNICAL contend that the cleanup was in any way ineffective or inappropriate? And Mr. Nyquist's response was, UNICAL wouldn't state for purposes of these proceedings that the cleanup was ineffective. That was on pages 1975 and 76 of the record. The court herself found, undisputed evidence in the record indicates that removal of the tarred-like and slag materials was an appropriate remedial measure. So, they chose the most appropriate measure that was protective of the environment. You couldn't have done anything else. And also, there were restrictions put on what could have been done because this was a wetlands. So, whether you could have put a berm in there or whether you could have done other things that would have impacted the flow of water through the wetlands, which is also a storm drain channel, I think those issues would have been raised by the Army Corps of Engineers and the Department of Fish and Game if those were even feasible alternatives, which they weren't. And there's testimony by Dr. Amini that the only feasible alternatives were either removal or leaving it in place. So, we would urge the court to adopt the Bedford affiliates approach, Your Honors, and find that under the circumstances of this case, there really was substantial compliance with the NCP and a CERCLA quality cleanup is what resulted from Carson Harbor's effort. Thank you. Thank you, Counsel. The case just argued will be submitted for decision and the court will adjourn.
judges: Hall, O'scannlain, Paez